# COURT OF APPEALS OF VIRGINIA

## Record No. 0542-25-1

JERRY VANN PORK, JR.

v.

COMMONWEALTH OF VIRGINIA

Present: Judges AtLee, Chaney and Bernhard
Argued by videoconference

Opinion Issued July 7, 2026[*]

### FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Brenda C. Spry, Judge

Taite A. Westendorf (Westendorf & Khalaf, PLLC, on brief), for appellant.

Aaron J. Campbell, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

### MEMORANDUM OPINION BY
### JUDGE RICHARD Y. ATLEE, JR.

Following a jury trial, the trial court convicted Jerry Vann Pork, Jr. of first-degree murder, attempted malicious wounding, and two counts of use of a firearm in commission of a felony. On appeal, Pork argues that the evidence was insufficient to support his convictions. He contends that the testimony of two Commonwealth witnesses, Jaquante Whitfield and Keeshawn Faltz, was inherently incredible and unworthy of belief. For the following reasons, we disagree and affirm his convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth," the prevailing party below. *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

On the evening of August 1, 2022, Bernard Clack drove Jaquante Whitfield and Aukeem White to Whitfield's cousin's house to celebrate Whitfield's birthday. On the way there, they stopped at an ABC store, and, once at the party, they drank and celebrated until midnight, when everyone wished Whitfield a happy birthday. Clack, Whitfield, and White left soon after.

Around 12:30 a.m., the group stopped at a Red Store convenience store. Clack, Whitfield, and White got out of the car and went inside. A group of people, including Pork, stood outside the store. Whitfield, after being shown the security camera footage, identified Pork as one of the individuals outside the store. Pork was wearing a black ski mask, a black t-shirt, black shorts, white socks, and black sneakers. Whitfield, who was thirty years old at the time of trial, testified at trial that he had known Pork since the ninth grade and that he knew him by the nickname "West."

After Clack, Whitfield, and White walked into the store, Pork walked over to Clack's car and looked in the front passenger window. White came out of the store, walked over, and shook Pork's hand, before going back in the store. Pork then walked back towards his group.

Approximately 30 seconds later, Clack, Whitfield, and White walked out of the store and got into Clack's car. As they walked to the car, the security camera footage showed that Pork pulled a handgun from his waistband and held it behind his back. Clack drove to the parking lot exit and waited to turn right. Pork stood watching Clack's car, still holding the gun behind his back. Whitfield testified that there had been some "disagreement" between the two groups and that Clack "fired off some rounds in the air" as they drove away. The security camera footage

- 2 -

showed that, a few seconds after Clack's car pulled out of the parking lot, Pork ducked down and then ran towards Clack's car as it drove away.

Four other men who had been standing with Pork immediately walked to the side of the store out of the sight of the security camera. One of the men pulled a firearm from his waistband as they walked. Pork turned and ran towards the side of the store where the four men had gone. Almost immediately after, a car emerged from the area beside the store and turned right, heading in the same direction as Clack's car.

Shortly after leaving the Red Store, Clack stopped at a red light at the intersection of Portsmouth Boulevard and Deep Creek Boulevard. As soon as Clack's car stopped, Whitfield "heard gunshots." Whitfield saw that Clack had been shot, and he himself had been "grazed." Whitfield testified that he tried to take cover and grab Clack, but Clack's body would not move. As he was trying to grab Clack, Whitfield got shot in the hand. Whitfield saw Pork on the driver's side of the car shooting at them and, while he knew there was more than one shooter, he could not tell which direction all the shots were coming from. Whitfield pulled out his gun and returned fire; he testified that he fired approximately 17 shots.

Whitfield and White got out of the car, and they pulled Clack over to the passenger side. White got in the driver's seat, and Whitfield got in the back. Whitfield held pressure on Clack's wound until they got to the hospital. At the hospital, Whitfield went into the emergency room and asked for help, and when the hospital staff grabbed Clack, both Whitfield and White took off running. Clack ultimately died of a gunshot wound to the head.

Whitfield returned to the hospital later that day, where he spoke with Detective Siniscalchi of the Portsmouth Police Department. He turned his gun over to the police the following afternoon. The police also obtained both White's and Clack's guns.

As part of Detective Siniscalchi's investigation he reviewed a Facebook profile with the name "West Now Whiskey." The detective recognized the photos attached to the profile as photos of Pork.

The police also investigated the scene of the shooting. A forensic technician collected bullet casings and fragments from various spots around the scene. Clack's car had bullet holes in the driver's side body, front windshield, and back windshield. A forensic scientist reviewing the evidence testified that 8 casings were fired from White's gun and 17 casings were fired from Whitfield's gun. There were also 7 casings fired from a Luger 9-millimeter, 28 casings fired from a .45 caliber firearm, and 1 casing fired from a .38 caliber firearm, none of which came from Whitfield's, White's or Clack's firearms.

Whitfield testified about the incident at trial. On cross-examination, Pork questioned him about inconsistencies in his description of Pork's clothing.[2] Whitfield repeatedly stated that he did not recall some of his prior statements. He explained that he had been drinking heavily since the incident and some details had "fainted from [his] mind." He acknowledged that he was a felon and that at the time of the shooting he was on probation and barred from possessing a firearm. He also acknowledged that the Commonwealth had agreed not to charge him with possession of a firearm by a felon in exchange for his testimony against Pork.

Keeshawn Faltz also testified. He testified that, at some point after the August 2 shooting, he met Pork in the Portsmouth City Jail, where they ended up in the same cell for around one-and-a-half to two months. He claimed that Pork confessed to the shooting. According to Faltz, Pork said that he was "beside the Red Store" and the victim came out and "started shooting in his direction for no reason." Pork and his group followed them and caught

---

[2] During a preliminary hearing, Whitfield described Pork as wearing a black hoodie with a skull design and white lettering.

up with them "by Portsmouth Boulevard and Deep Creek," which is when Pork shot into the car. Faltz explained that Pork did not give him too many details, and he did not ask too many questions. Faltz claimed that the conversation came up because Pork was "venting" to him.

Faltz, who had been convicted of multiple felonies, stated that he did not receive anything in exchange for his testimony. He denied talking to any prosecutor. The Commonwealth, however, stipulated that Faltz did in fact receive bond in exchange for his testimony. It also stipulated that it had "agreed to give him substantial consideration" on his pending charges, and it in fact believed that a previous prosecutor had agreed to drop the charges against him. Faltz denied knowing anything about the consideration. He claimed that his lawyer "and the detective said [he] was not promised . . . anything for [his] testimony." He later clarified that he was not promised "anything specific," and he thought he only got out on bond for his safety.

After the Commonwealth concluded its case-in-chief, Pork moved to strike the evidence. He argued that the only evidence linking him to the offense was the testimony of Whitfield and Faltz, which he contended was "so sufficiently incredible" as to not be such that a jury could base a guilty verdict upon. He argued that Whitfield's testimony was "evasive, argumentative," and "all over the place," while Faltz was basically just a "jailhouse snitch." The trial court denied the motion, finding that credibility was an issue for the jury.

Pork presented no evidence, and he renewed his motion to strike, which the trial court again denied. The jury ultimately found Pork guilty of first-degree murder, attempted malicious wounding, and two counts of use of a firearm in the commission of a felony. Pork now appeals his convictions.

ANALYSIS

On appeal, Pork challenges the sufficiency of the evidence to sustain his convictions, arguing that the testimony of Whitfield and Faltz was inherently incredible and unworthy of belief. We disagree.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 85 Va. App. 435, 454-55 (2025) (alteration in original) (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* at 455 (alteration in original) (quoting *McGowan*, 72 Va. App. at 521). Instead, "[t]he only 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cappe v. Commonwealth*, 304 Va. 86, 87 (2025) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Smith*, 85 Va. App. at 455 (quoting *McGowan*, 72 Va. App. at 521).

"The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder," in this case the jury. *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). This Court, consistent with its limited role on appeal "must accept 'the [factfinder]'s determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Hammer v.*

*Commonwealth*, 74 Va. App. 225, 239 (2022) (quoting *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019)).

The inherent incredibility standard presents an extremely high hurdle on appeal. Evidence is not inherently incredible "unless it is 'so manifestly false that reasonable [people] ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). "As this Court has previously recognized, '[a] legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness'[s] testimony or statements.'" *Grimaldo v. Commonwealth*, 82 Va. App. 304, 323 (2024) (alterations in original) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* (quoting *Kelley*, 69 Va. App. at 626). But "we cannot say that a witness's testimony is '*inherently* incredible [unless it is] *so* contrary to the human experience as to render it unworthy of belief.'" *Id.* at 321 (alteration in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

Whitfield identified Pork on the security camera footage, and he testified that Pork was one of the shooters. Whitfield testified that he had known Pork since high school, which was approximately 15 years. Given how long he had known Pork, and that he had just seen him at the Red Store before the shooting, the jury could find that Whitfield's identification of Pork was credible.

Although there were inconsistencies in Whitfield's testimony, including in his description of the shooter's clothing, this does not render his testimony inherently incredible as a matter of law. Whitfield was extensively cross-examined about his inconsistent description of the

shooter's clothing, his criminal history, and his inability to recall his prior statements. He explained that he had been drinking since the shooting and that some issues had "fainted from [his] mind." These inconsistencies, along with his explanation for them, were properly submitted to the jury to resolve. *Grimaldo*, 82 Va. App. at 323 (noting that "inconsistencies or contradictions are factors considered in the overall assessment of witness credibility" which is submitted to the factfinder). Likewise, any motive that Whitfield may have had for testifying was "appropriately weighed as part of the entire issue of witness credibility, which [wa]s left to the jury to determine." *Juniper*, 271 Va. at 415.

Further, other evidence corroborated parts of Whitfield's testimony. *See Lambert*, 70 Va. App. at 760 (noting that witness testimony is not inherently incredible when corroborated by other evidence). The security camera footage from the Red Store showed how Pork almost immediately focused on Whitfield, Clack, and White when they arrived. It also showed the interaction between them, including how Pork first ran after the car and then ran to the side of the store, where a vehicle emerged almost immediately after and then followed Clack's car. Additionally, the number, type, and location of the shell casings located at the scene corroborated aspects of Whitfield's description of the shooting. Thus, Whitfield's testimony was not inherently incredible as a matter of law.

As to Faltz, parts of his testimony were consistent with other evidence. Though Faltz consistently denied getting consideration in exchange for his testimony, the Commonwealth did exactly what it was supposed to do by correcting the record, and it stipulated to the fact that Faltz did in fact receive consideration for his testimony. Pork had the opportunity to question Faltz about his denial. Faltz denied that he knew anything about the consideration, saying that his lawyer and the detective told him he was not promised anything. He later clarified that he was not promised "anything specific." This issue was there for the jury to weigh and consider, and,

in his closing argument, Pork strenuously argued that the witnesses were not credible. Thus, the issue was put squarely before the jury.

The trial court instructed the jury that its duties included assessing witness credibility. The jury, as the trier of fact, was "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) (quoting *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc)). Here, the jury accepted at least parts of Whitfield's and Faltz's testimony as credible. This conclusion will not be overturned on appeal because Whitfield's and Faltz's testimony was not, as a matter of law, inherently incredible.

## CONCLUSION

For these reasons, we find that neither Whitfield's nor Faltz's testimony was inherently incredible. Therefore, the evidence was sufficient to sustain the convictions. The trial court is affirmed.

*Affirmed.*